# United States Tax Court

T.C. Memo. 2025-9

KARL W. LEO AND FAY L. LEO,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 12519-20.                                      Filed January 29, 2025.

_____

*Ethan J. Vernon*, *Robert B. Gardner III*, *Anson H. Asbury*, and *Maggie-Machre K. Garrett*, for petitioners.

*John T. Arthur*, *Rubinder K. Bal*, and *Jenna N.E. Scott*, for respondent.


TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 2

FINDINGS OF FACT ........................................................... 3

OPINION.......................................................................... 19

I.   The value of the Bankhead Property was $4,050,000................... 19

   A.   The contents of the Campbell appraisal are not binding
        on the Commissioner and the appraisal is unpersuasive
        to the Court. ........................................................... 19

   B.   Singleton's expert testimony that the value of the
        Bankhead Property is $12,425,000 is also unpersuasive.
        ............................................................................. 21

   C.   Ladner's testimony that the value of the Bankhead
        Property is $4,050,000 is persuasive..................................... 25

**Served 01/29/25**

[*2] D. The Leos' fallback position that the value of the Bankhead Property was $7,941,000 has no merit. ................ 29

II. The amounts of the deficiencies and underpayments determined in the Notice of Deficiency are correct. ...................... 30

III. The Leos are liable for the 40% gross valuation misstatement penalty. .................................................................................. 31

## MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, *Judge*: On October 20, 2020, respondent, the Commissioner of Internal Revenue (Commissioner), mailed a Notice of Deficiency to petitioners, the Leos. The Notice of Deficiency determined that the Leos are liable for the following deficiencies and penalties:

| Year | Deficiency | Penalty § 6662(h)[1] |
|------|------------|----------------------|
| 2016 | $855,262 | $342,104.80 |
| 2017 | 979,885 | 391,954.00 |

The Leos filed a timely Petition. We have jurisdiction to redetermine the deficiencies and penalties under section 6213(a).

The issue underlying the deficiency determinations is the value of buildings and 136.4 acres of land in Union County, Mississippi, as of December 31, 2013. We refer to the buildings and the land as the Bankhead Property. The Bankhead Property was contributed to a charity on December 31, 2013, and the Leos claimed a charitable-contribution deduction that they carried over to tax years 2016 and 2017. The Leos take the position that the value of the Bankhead Property was $12,425,000. The Commissioner takes the position that the value is $4,050,000. We hold for the Commissioner on the valuation issue. *See infra* Part I. We therefore sustain the deficiencies. *See infra* Part II.

We also sustain the section 6662(h) penalties. *See infra* Part III.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, and regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times.

3

FINDINGS OF FACT

The Leos were residents of Alabama when they filed their Petition.

The Bankhead Property is northeast of state Highway 178 in Union County, Mississippi. Its land area is 136.4 acres.

In 1948 a furniture factory was constructed on the Bankhead Property by Morris Futorian. As explained by a historical marker near the highway, the factory was the origin of "Northeastern Mississippi's upholstered furniture industry." From 1955 to 1972 several buildings were added to the factory. These additions brought the total building area of the factory to 1,093,345 square feet. The factory included manufacturing space, offices, and warehouses.

From 2000 to 2002 the operations of the factory, but not the factory buildings or any of the land, were purchased by Caye Home Furnishings, LLC (Caye Home). The assets purchased by Caye Home included inventory, accounts receivable, and customer relationships. Caye Home also acquired the workforce at the factory. At this time Karl Leo had a minority interest in Caye Home. Caye Home was the sole member of Caye Upholstery, LLC (Caye Upholstery).

The Bankhead Property was bought by Vanguard Properties, LLC (Vanguard Properties), on February 19, 2002, for $2,750,000. None of the parties in our case contend that the sale was at arm's length. Karl Leo had a minority interest in Vanguard Properties at the time of the sale.

On February 19, 2002, Vanguard Properties executed a lease with Caye Upholstery. The term of the lease was February 20, 2002, to December 31, 2011. The leased premises were 660,000 square feet of building space of the Bankhead Property. The lease identified the area to be leased as follows:

> Landlord [Vanguard Properties], for and in consideration of the rents herein reserved and of the covenants and agreements herein contained on the part of Tenant [Caye Upholstery] to be performed, hereby leases to Tenant, and Tenant hereby lets from Landlord, 660,000 interior square feet of the real estate known as 1201 W. Bankhead, New Albany, Mississippi, and legally described on Exhibit A attached hereto (the "Project"), together with

[*4]    the exclusive use of the interior warehouse and office space in Landlord's building and common use of certain adjoining exterior loading, parking and drive areas identified on the Site Plan attached hereto as Exhibit B. Such real estate, improvements and appurtenances shall hereinafter sometimes jointly or severally, as the context requires, be referred to as "Leased Premises"). A description of the Leased Premises is set forth on Exhibit B.

Exhibit A was a metes-and-bounds description of the land of the Bankhead Property. Exhibit B was a one-page plan of three of the four buildings on the Bankhead Property: specifically, the easternmost building, the northernmost building, and the central building. The plan did not show the truck-maintenance building, thus indicating that no part of this building was subject to the lease. The plan does not appear to indicate what specific areas of the three buildings shown on the plan were leased. Although the parties in our case have stipulated that the building area that was leased was 660,000 square feet, they did not stipulate which portions of the three buildings were under lease. It is unclear from the record which areas of the three buildings were under lease. It is also unclear from the record why Caye Upholstery, not Caye Home, was the lessee. None of the parties in our case contend that the lease between Vanguard Properties and Caye Upholstery contains arm's-length rental terms.

On August 16, 2002, Vanguard Properties leased 45,000 square feet of the easternmost building on the Bankhead Property to CIGS, LLC (CIGS). The term of the lease was August 16, 2002, through August 31, 2005. The rent was $3,750 per month (i.e., $45,000 per year). The total square footage of the easternmost building was 185,474 square feet. Thus, the area under lease comprised only part of the easternmost building. This leased area apparently was not already subject to the July 20, 2002, lease to Caye Upholstery.

As of January 1, 2003, Vanguard Properties and Karl Leo were members of Caye Home.

On February 24, 2003, Vanguard Properties and CIGS amended the August 2002 lease. Under the amendment, the portion of the Bankhead Property to be leased was altered to consist of the property described in Exhibit A to the amendment. However, the amendment had no Exhibit A. Nor did the amendment state the number of square feet under lease. Therefore it is unclear how much of the easternmost

[*5] building was leased. Under the amendment, the new term of the lease was August 16, 2002, to December 31, 2005.

During 2002 and 2003 Vanguard Properties paid approximately $196,000 for roof repairs for the Bankhead Property.

On October 9, 2003, Vanguard Properties and Caye Upholstery amended their February 2002 lease. Under the amendment, the leased premises were "expanded" to the area described in Exhibit B1 to the amendment. However, Exhibit B1 to the amendment was not attached to the amendment. Therefore, it is unclear how much of the Bankhead Property was leased.

On December 31, 2003, Vanguard Properties and Caye Upholstery again amended their February 2002 lease. Under the amendment, the leased premises were "expanded" to the area described in Exhibit B1 to the amendment. However, Exhibit B1 to the amendment was not attached to the amendment. Therefore, it is unclear how much of the Bankhead Property was leased.

On February 20, 2004, Vanguard Properties installed the following items on the Bankhead Property: a cooling tower, two pumps, and a chiller. The total cost of these installations was $395,129.90.

On June 24, 2005, Vanguard Properties and Caye Upholstery again amended their February 2002 lease. The amended lease required Vanguard Properties to install a telephone system on the leased premises. The amendment did not contain a provision altering the leased premises.

In 2005 Vanguard Properties installed a new telephone system on the Bankhead Property at the cost of approximately $50,000.

Effective August 24, 2005, Vanguard Properties and Caye Upholstery again amended their February 2002 lease. The amendment extended Caye Upholstery's lease right to use "all of the Property." However, the term "the Property" was undefined. Under the amendment, the lease term was February 20, 2002, to December 31, 2014.

On January 1, 2007, Karl Leo became the sole member of Vanguard Properties.

**[*6]**     On April 1, 2007, Vanguard Properties executed a lease with Caye Home.  The lease provided that the premises to be leased were defined in Exhibits A and B, but neither document was attached to the lease. The Leos contend, and the Commissioner does not contest, that the leased premises comprised the entire Bankhead Property.  The term of the lease was April 1, 2007, to March 31, 2017.  The lease apparently superseded or replaced the February 2002 lease between Vanguard Properties and Caye Upholstery.  None of the parties in our case contend that the April 2007 lease between Vanguard Properties and Caye Home contains arm's-length rental terms.

From 2007 to 2012 Toyota constructed an assembly plant in Blue Springs, Mississippi.  Toyota selected Blue Springs as the location of the plant because the workforce in the region had expertise in manufacturing.  The plant is 13.1 miles from the Bankhead Property. The plant began producing cars in 2011.  When the plant was completed in 2012, Toyota was the world's biggest carmaker.

On April 24, 2008, Karl Leo and Fay Leo became the sole managers of Vanguard Properties, and Karl Leo began serving as chair and president of Vanguard Properties.

Sometime in September 2010 Vanguard Properties executed a lease on a portion of the easternmost building on the Bankhead Property with Industrial Timber, LLC (Industrial Timber).  Industrial Timber was formerly known as CIGS.  Although the only copy of the lease in the record is an unexecuted draft of the lease, Karl Leo credibly testified that the final lease contained all the terms of the draft.  The rent was $1.05 per square foot per year.  The term of the lease was October 1, 2010, to September 30, 2015.  The area of the building under lease was not specified in the draft lease.  Nor did Karl Leo testify what area was leased in the final lease.  We reasonably infer that the area of the building under lease to Industrial Timber was the same 45,000-square-foot area that was subject to the August 16, 2002 lease.

In 2010 Caye Home went bankrupt, and its business assets were purchased by Newport Furniture Co., Inc. (Newport Furniture). Newport Furniture was a newly formed corporation owned by the former managers of Caye Home.  Newport Furniture was formed by S. Tom Wathen, Jr., its president. The vice president of Newport Furniture was Wayne Stewart, the former chief financial officer of Caye Home. Newport Furniture was engaged in the business of manufacturing upholstered furniture.  Karl Leo, Fay Leo, or Vanguard Properties never

[*7] owned (directly or indirectly) any shares of Newport Furniture. When Caye Home went bankrupt, it abandoned its April 2007 lease with Vanguard Properties.

On September 28, 2010, Newport Furniture entered into a five-year lease with Vanguard Properties for a portion of the Bankhead Property that the parties in this case have stipulated consisted of 500,000 square feet of building area. The Commissioner contends, and we agree, that the lease contains arm's-length terms. The term of the lease was October 1, 2010, to September 30, 2015. The rent was $240,000 per year. This works out to rent per square foot per year of 48 cents. The area of leased premises was specified by a map attached to the lease. The map showed that the entire northernmost building—a warehouse of 198,000 square feet—was included in the lease. The map showed that none of the westernmost building—the truck-maintenance building—was included in the lease. The map showed that none of the easternmost building was included in the lease. The map showed that southeast portions of the central building were not included in the lease, but that the rest of the central building, including a 124,600-square-foot warehouse area in the northwest portion of the central building, was included in the lease.

Section 9.1 of the September 2010 Newport Furniture lease required Newport Furniture to maintain the leased premises, including the mechanical systems. However, section 9.1 limited Newport Furniture's responsibility for repairing the leased premises to $50,000 per "instance" of repairs.

The September 2010 Newport Furniture lease required Newport Furniture to undertake reasonable efforts to recruit tenants for the unleased portion of the Bankhead Property. Under the lease, if Newport Furniture successfully recruited a tenant, it would receive one-third of the net rent received from the tenant. To recruit new tenants, Newport Furniture enlisted the help of the local governmental development authority. During Newport Furniture's tenancy (October 2010 to 2013), neither Newport Furniture nor the local-government development authority successfully recruited any new tenants. The director of industrial development at the authority credibly testified that new tenants could not be recruited for three reasons: (1) the property to be leased was too big, (2) the low ceilings of the buildings, and (3) the poor condition of the buildings. He explained that the buildings on the Bankhead Property were specifically unsuitable for leasing to the suppliers to the Toyota plant.

[*8] In July 2011 Vanguard Properties filed a property tax appeal with the county. In its appeal, Vanguard Properties stated that the Bankhead Property consists of land and a "1.16 million square foot manufacturing building, approximately one-half of which is vacant." It stated that the "other half of the building is rented by [Newport Furniture] and used as a furniture manufacturing facility."[2]

On February 22, 2012, Vanguard Properties entered into a ten-year lease with Roberts Trucking, LLC (Roberts Trucking), for the westernmost building, which was a truck-maintenance building of 10,624 square feet, along with 6.59 acres of land. The term of the lease was March 1, 2012, to February 28, 2022. The rent set forth in the lease was $6,000 per year, which is 57 cents per square foot. Roberts Trucking was a trucking company that operated tractor-trailers. Although before the lease the building had been used for warehousing, it was designed to be used for the maintenance and repair of tractor-trailers. Under the lease, Roberts Trucking was required to maintain and repair the leased premises. Under the lease, Roberts Trucking was also required to perform ten specific improvements to the leased premises by December 31, 2012. As long as Roberts Trucking complied with its obligations under the lease, it was not required to pay rent until March 1, 2017. In fact, Roberts Trucking did not pay rent until March 1, 2017. In 2013 Roberts Trucking moved into the truck-maintenance building. On July 31, 2018, Roberts Trucking moved out of the building.

Beginning May 1, 2013, Newport Furniture stopped paying the rent to Vanguard Properties required under the September 2010 lease.

On June 28, 2013, Newport Furniture filed a voluntary petition for chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Northern District of Mississippi.

As of June 28, 2013, Newport Furniture had failed to maintain the leased premises of the Bankhead Property as required by section 9.1 of its September 2010 lease with Vanguard Properties. There were at least 22 instances of repairs needed for the Bankhead Property: 16 attributable to roof repairs, 2 for exterior siding and door repairs, 2 for parking repairs, and 2 for road repairs. Newport Furniture's responsibility for any one instance of repairs was limited to $50,000 under its September 2010 lease with Vanguard Properties. Taking this

---

[2] In our view there were four buildings on the Bankhead Property, not one, for a total area of 1,093,345 square feet. The statement that half the space was rented and half was vacant was essentially accurate.

[*9] $50,000 limit into account, Vanguard Properties estimated that Newport Furniture owed it $1,099,000 for damages for failing to maintain the Bankhead Property.

On July 11, 2013, Newport Furniture's bankruptcy case was converted to a chapter 7 liquidation case.

On July 16, 2013, Mercy Foundation and Vanguard Properties signed a nonbinding letter of intent. The letter stated that Mercy Foundation was willing to buy the Bankhead Property for $575,000 as a bargain sale. The letter stated that the charitable-contribution tax deduction associated with the sale would be $15,925,000 or more. The letter stated that, following the execution of a binding contract to buy the Bankhead Property, Mercy Foundation would order an appraisal of the property and would have the right to cancel the contract if the appraised value was less than $15,000,000.

On August 19, 2013, Mercy Foundation wrote a letter to Vanguard Properties that it had found an appraiser who was willing to appraise the Bankhead Property by August 30, 2013. The appraiser was Harold Campbell. The letter stated that Campbell's firm had already done some "preliminary" work and had determined that "our opinion of value is within acceptable ranges."

On August 19, 2013, Vanguard Properties retained Campbell to appraise the Bankhead Property. The appraisal fee was $5,000.

On November 7, 2013, Vanguard Properties emailed Mercy Foundation a "proposed lease with the tenant." This was an as-yet unexecuted lease between Vanguard Properties and Newport Home Furnishings, LLC (Newport Home), for $202,500 per year for 450,000 square feet of building space for a five-year term from November 1, 2013, to October 31, 2018. Newport Home had taken over the business formerly operated and owned by Newport Furniture. The proposed lease apparently was to supersede the September 2010 lease between Vanguard Properties and Newport Furniture. The proposed lease was apparently a draft of the December 19, 2013, lease that we describe later.

On December 9, 2013, Tioga Environmental Consultants wrote an environmental assessment report for Mercy Foundation regarding the Bankhead Property. Tioga took approximately 300 photographs of the interior and the exterior of the Bankhead Property. The photographs were included in the report. The photographs showed water

**[*10]** damage to the floors and the walls from flooding, water damage to the ceilings from leaks, mold growth on the walls, and rust on the ceilings.

On December 19, 2013, Vanguard Properties and Newport Home executed a lease of a portion of the Bankhead Property that the parties in this case have stipulated consists of 450,000 square feet of the building area.[3] The effective date of the lease was November 1, 2013. The term of the lease was November 1, 2013, to October 13, 2018. The rent was $202,500 annually, which is 45 cents per square foot. This was the same rental rate as in the proposed lease described earlier.

On December 31, 2013, Vanguard Properties sold the Bankhead Property to Mercy Foundation in exchange for (1) a $10,000 cash payment and (2) a promissory note for $565,000. The note required Mercy Foundation to pay the $565,000 principal amount (and interest accumulating at a rate of 0.5% per year) on March 31, 2016. As part of the sale, Vanguard Properties assigned to Mercy Foundation two leases: (1) "The Lease between Vanguard Properties II, LLC and Newport Home Furnishings, LLC dated November 1, 2013" (presumably the December 19, 2013, lease between Vanguard Properties and Newport Home, which was effective November 1, 2013) and (2) the February 22, 2012, lease between Vanguard Properties and Roberts Trucking. Because Vanguard Properties and Mercy Foundation anticipated that Mercy Foundation would finance the purchase price of the Bankhead Property from rents received from tenants on the property, the note required Mercy Foundation to use commercially reasonable efforts to enter into leases for the unleased portions of the Bankhead Property. The sales agreement stated that an appraisal by Campbell had valued the Bankhead Property, as of December 2, 2013, at $15,800,000.

---

[3] A map attached to the lease shows the leased area. The leased area shown on the map is identical to the leased area shown on the September 2010 lease to Newport Furniture except it appears to omit two areas of the central building that had been shown as the leased area in the September 2010 lease: an area marked as 11,550 square feet and an area marked as 10,000 square feet. These omissions might suggest that the area of the leased premises under the December 2013 lease was 478,450 square feet (i.e., the 500,000 square feet under the September 2010 lease minus 11,550 square feet minus 10,000 square feet). But this would be inconsistent with the stipulation by the parties in this case that the leased premises is 450,000 square feet. It is appropriate to adopt the stipulated square footage. The two maps we are comparing are not clearly marked. The stipulated amount is therefore not clearly contrary to the record. And none of the parties have sought to be relieved of the stipulation as to square feet.

[*11]  On December 31, 2013, the area of the buildings on the Bankhead Property was still 1,093,345 square feet.  Eight of the 136.4 acres of land making up the Bankhead Property were in the City of New Albany.  The Bankhead Property was not zoned except for eight acres in the City of New Albany.  This portion of the Bankhead Property was zoned "I-L, Industrial District."

Only half of the building area of the Bankhead Property was under lease from the date of Vanguard Properties' lease with Newport Furniture, September 28, 2010, to the valuation date, December 31, 2013.  This is shown in the table below:

| | Period | | |
| --- | --- | --- | --- |
| | Sept. 28, 2010, to Feb. 21, 2012 | Feb. 22, 2012, to Oct. 31, 2013 | Nov. 1 to Dec. 31, 2013 |
| Industrial Timber lease building area | 45,000 | 45,000 | 45,000 |
| Newport Furniture lease building area | 500,000 | 500,000 | — |
| Roberts Trucking lease building area | — | 10,624 | 10,624 |
| Newport Home lease building area | — | — | 450,000 |
| Total building area under lease | 545,000 | 555,624 | 505,624 |
| Total building area | 1,093,345 | 1,093,345 | 1,093,345 |
| Percentage of total building area under lease | 49.85% | 50.82% | 46.25% |

In March 2014 Newport Furniture vacated the portions of the buildings that it had leased.

None of the parties in our case contest that Vanguard Properties was a disregarded entity for federal income tax purposes for all relevant tax years, i.e., for tax years 2013–17.

To their 2013 Form 1040, U.S. Individual Income Tax Return, the Leos attached a December 5, 2013, appraisal signed by Campbell that valued the Bankhead Property at $15,800,000 as of December 2, 2013.  The Form 1040 claimed a charitable-contribution deduction for the Bankhead Property of $15,225,000, as calculated before adjusted gross income (AGI) limitations.  This $15,225,000 amount is the difference between the $15,800,000 appraised value and the $575,000 sale price.

**[\*12]** The Form 1040 reported that the amount of charitable contributions subject to the 30% of AGI limit was $15,225,000. This was the same amount claimed by the Form 1040 as the charitable-contribution deduction for the Bankhead Property. The Form 1040 reported that 30% of AGI was $3,249,390. The Form 1040 reported that the deduction for the charitable contributions subject to the 30% of AGI limit, after taking into account the limit, was $3,249,390. The parties have stipulated: "For their 2013 tax year, Petitioners used $3,249,390 of the deduction claimed for the bargain sale of the Bankhead Property." This stipulation is consistent with the record, and it is appropriate for us to adopt it. The Form 1040 reported that the charitable-contribution deduction subject to the 30% of AGI limit that would be carried forward to subsequent years was $11,975,610. This amount is equal to $15,225,000 minus $3,249,390.

As explained above, an appraisal of the Bankhead Property by Campbell was attached to petitioners' 2013 Form 1040. According to the Campbell appraisal, the Bankhead Property consisted of three buildings.

Campbell described Building 1 as the "original building . . . located in the center of the facility." It is likely that this was the center building. Campbell made the following observations about Building 1: its "[c]ondition" was "[a]verage"; it comprised 750,000 square feet; all 750,000 square feet was "rentable"; its "[c]olumn spacing" was 24 feet; it had 15 overhead doors; its ceiling height was 12 to 14 feet but the "shipping area has 14' ceilings"; its "[h]eating" was "[h]anging gas blower heaters"; its "[c]ooling" was "[c]entral"; its "[e]lectrical" was "[p]resumed [g]ood"; and its "[p]lumbing [c]ondition" was "[p]resumed [g]ood."

Campbell described Building 2 as the "warehouse area at the north end." It is likely that this was the northernmost building. Campbell made the following observations about Building 2: its "[c]ondition" was "[a]verage"; it comprised 200,000 square feet; all 200,000 square feet was "rentable"; its "[c]olumn spacing" was 24 feet; it had 15 overhead doors; its ceiling height was 12 to 20 feet but the "shipping area has 14' ceilings"; its "[h]eating" was "[h]anging gas blower heaters"; its "[c]ooling" was "[c]entral"; its "[e]lectrical" was "[p]resumed [g]ood"; and its "[p]lumbing [c]ondition" was "[p]resumed [g]ood."

**[\*13]** Campbell described Building 3 as the "warehouse area at the eastern end." It is likely that this was the easternmost building. Campbell made the following observations about Building 3: its "[c]ondition" was "[a]verage"; it comprised 200,000 square feet; all 200,000 square feet was "rentable"; its "[c]olumn spacing" was 24 feet; it had 15 overhead doors; its ceiling height was 14 to 32 feet but the "shipping area has 14' ceilings"; its "[h]eating was "[h]anging gas blower heaters"; its "[c]ooling" was "[c]entral"; its "[e]lectrical" was "[p]resumed [g]ood"; and its "[p]lumbing [c]ondition" was "[p]resumed [g]ood."

Campbell made observations about the conditions of all three buildings he considered to make up the Bankhead Property. He stated:

- "There have been numerous renovations through the years, which despite the buildings [sic] age, make it as functional and useful as newer buildings."

- "Overall design and functional utility of the building is good."

- "[B]ecause of its ceiling heights, this property lends itself well for storage purposes."

- "The plumbing . . . is assumed to be in good condition."

- "According to the current occupants, the air conditioning is considered satisfactory.

- "Overall, the subject is in average condition."

- Because of improvements and renovations, the Bankhead Property "is as functional and useful today as a building that was built in the last 20 years."

Campbell opined that the Bankhead Property "is older but has been mostly well maintained over its life."

Campbell included in his appraisal 12 photographs of the Bankhead Property, of which 7 were interior views. Of these 7 photographs of interior views, one was described by Campbell as a typical view of the "interior," two he described as typical views of the "office area," and four he described as typical views of the "warehouse area."

**[*14]** Campbell observed that three specific renovations had been made to the Bankhead Property after its purchase by Vanguard Properties. First, Campbell stated that a telecommunications antenna had been installed on top of the preexisting water tower in June 2003. Second, Campbell stated that a cooling tower was installed in 2004, which "has had very little use." Third, Campbell stated: "In 2009 the truck maintenance facility was in poor condition, but was refurbished to its current working level by Roberts Trucking." The reference to the truck-maintenance facility was apparently to the westernmost building, although we cannot explain why the Campbell report does not enumerate this building as it did the other three buildings.

Campbell opined that the land value of the Bankhead Property as vacant was $614,000. But his appraisal did not place much weight on the land-value-as-vacant approach.

Campbell opined that the income approach was not appropriate for valuing the Bankhead Property because the buildings were designed to be occupied by their owner rather than leased.

Campbell stated that the cost approach was a "reliable indicator" of value because the Bankhead Property was "mostly well maintained over its life" and was in "average condition." Campbell estimated that the cost of constructing a new building on the Bankhead Property would be $16,200,000.

However, Campbell's valuation gave the "most consideration" to the sales-comparison approach, under which he concluded that the value of the buildings was $15,800,000. Campbell relied on sales of comparable buildings in "average" condition.

Campbell ultimately concluded, taking into account the cost approach and the sales-comparison approach, that the value of the Bankhead Property was $15,800,000.

For most of 2014 the buildings on the Bankhead Property sat vacant. Mercy Foundation was unable to find anyone to rent the property.

On December 31, 2014, Mercy Foundation and Vanguard Properties agreed to cancel the $565,000 promissory note in exchange for Mercy Foundation's payment to Vanguard Properties of $40,000.

**[\*15]**  Failing to find any tenant to rent the Bankhead Property, Mercy Foundation decided to sell it.

In December 2014 Mercy Foundation received an offer for $1,075,000 by a prospective buyer who would have demolished the buildings and removed all materials and debris.

On March 11, 2015, New Albany Acquisitions, LLC, agreed to buy the Bankhead Property for $1,400,000.  The agreement allowed New Albany Acquisitions 45 days to inspect the property and gave it the right to cancel the agreement during the 45-day period.  John Young, the owner of New Albany Acquisitions, asked his son Terry Young to inspect the Bankhead Property.  Terry Young had substantial experience in construction and in managing real estate.  It took him several days to inspect the Bankhead Property.  He determined that a substantial portion of the central building was in a "severe state of disrepair."  He determined that the condition of its roof was "severe."  He observed small trees and shrubs growing out of a large section of the roof.  He observed that one section of the roof was caved in from rust and root damage.  As to the mechanical systems in the buildings, he made the following observations: the heating and air systems were not functioning; the plumbing systems did not work; the fire suppression system did not work; and only portions of the electrical system worked.  Only some portions of the buildings on the property, Terry Young determined, were in rentable condition.

On April 23, 2015, Mercy Foundation and New Albany Acquisitions agreed to a reduction of the purchase price to $1,150,000.

On May 12, 2015, Mercy Foundation and New Albany Acquisitions agreed to a reduction of the purchase price to $1,130,000.

On May 29, 2015, Mercy Foundation and New Albany Acquisitions closed on the sale of the Bankhead Property at the reduced price of $1,130,000. New Albany Acquisition's plan for the buildings was to demolish the portions of the buildings with caved-in roofs.  New Albany Acquisitions eventually demolished between 75,000 and 100,000 square feet of the buildings.  New Albany Acquisitions also gutted all of the office space and substantial parts of the mechanical systems.

The Leos' Form 1040 for 2014 reported that the charitable-contribution deduction for contributions that are subject to the 30% AGI limitation and that would be carried forward from prior years was $12,540,610.  This $12,540,610 amount is $565,000 greater than the

**[*16]** corresponding $11,975,610 amount reported on the Form 1040 for 2013. As discussed before, on December 31, 2013, Vanguard Properties had sold the Bankhead Property to Mercy Foundation in exchange for a $10,000 cash payment and a $565,000 promissory note. Then, effective December 31, 2014, Vanguard Properties had agreed to terminate the note in exchange for a $40,000 cash payment from Mercy Foundation. We infer therefore that the Form 1040 for 2014 was intended to claim that the amount of the charitable contribution of the Bankhead Property made in 2013 should be $15,790,000 (equal to $15,800,000 minus $10,000), not the $15,225,000 amount reported on the 2013 return (equal to $15,800,000 minus $575,000).[4] The Form 1040 for 2014 did not report any charitable contributions made during 2014 and subject to the 30% of AGI limitation. The Form 1040 for 2014 reported a deduction for "[t]otal prior year carryovers" of $1,923,346. This amount is equal to 30% of the AGI reported for the 2014 year. The parties have stipulated that "[f]or their 2014 tax year, Petitioners used $1,923,346 of the carryforward deduction claimed for the 2013 bargain sale of the Bankhead Property." This stipulation is consistent with the trial record, and it is appropriate for us to adopt it. The 2014 return reported that the charitable-contribution deduction subject to the 30% of AGI limit that would be carried forward to subsequent years was $10,617,264. This amount is equal to $12,540,610 minus $1,923,346.

The Leos' 2015 Form 1040 reported that the charitable-contribution deduction for contributions that are subject to the 30% of AGI limitation and that would be carried forward from prior years was $10,577,264. This amount is $40,000 less than the corresponding $10,617,264 amount reported on the 2014 Form 1040. As discussed before, on December 31, 2013, Vanguard Properties had sold the Bankhead Property to Mercy Foundation in exchange for a $10,000 cash payment and a $565,000 promissory note. Then, effective December 31, 2014, Vanguard Properties had agreed to terminate the note in exchange for a $40,000 cash payment from Mercy Foundation. We infer therefore that the Leos' 2015 Form 1040 was intended to claim that the amount of the charitable contribution of the Bankhead Property made in 2013 should have been $15,750,000 (equal to $15,800,000 minus $50,000), not the $15,225,000 amount reported on the 2013 return (equal to $15,800,000 minus $575,000). The 2015 Form 1040 did not report any charitable contributions made during 2015 and subject to the

---

[4] This calculation does not account for the $40,000 cash payment agreed to on December 31, 2014, which we think was accounted for in the Form 1040 for 2015, as described later.

**[\*17]** 30% of AGI limitation.  The 2015 Form 1040 reported a deduction for "[t]otal prior year carryovers" of $2,041,594.  This amount is equal to 30% of the AGI reported for the year.  The parties have stipulated that "[f]or their 2015 tax year, Petitioners used $2,041,594 of the carryforward deduction claimed for the 2013 bargain sale of the Bankhead Property."  This stipulation is consistent with the trial record, and it is appropriate for us to adopt it.  The 2015 return reported that the charitable-contribution deduction subject to the 30% of AGI limit that would be carried forward to subsequent years was $8,535,670.  This amount is equal to $10,577,264 minus $2,041,594.

The Leos' 2016 Form 1040 reported that the charitable-contribution deduction for contributions that are subject to the 30% of AGI limitation and that would be carried forward from prior years was $8,535,670.  This is the same amount that was reported on the 2015 Form 1040 as the charitable-contribution deduction subject to the 30% of AGI limit that would be carried forward to 2016 and subsequent years.  The 2016 Form 1040 did not report any charitable contributions made during 2016 and subject to the 30% of AGI limitation.  The 2016 Form 1040 reported that $21 of charitable contributions made during 2016 was subject to a 30% of AGI limitation category different from the category applicable to the charitable contribution of the Bankhead Property.  The 2016 Form 1040 reported a deduction for "[t]otal prior year carryovers" of $2,565,256.  This amount is equal to 30% of the AGI reported for the year.  The parties have not stipulated the amount used by the Leos on their 2016 return of the carryforward deduction claimed for the 2013 bargain sale of the Bankhead Property.  We find this amount to be $2,565,256.  This is the amount by which the Notice of Deficiency reduced the charitable-contribution deduction claimed by the Leos on their 2016 Form 1040.  The 2016 Form 1040 reported that the charitable-contribution deduction subject to the 30% of AGI limit that would be carried forward to subsequent years was $5,970,414.  This amount is equal to $8,535,670 minus $2,565,256.

On August 26, 2019, the Leos filed a 2017 Form 1040X, Amended U.S. Individual Income Tax Return.  The original Form 1040 is not in the record.  However, the Form 1040X reflects some of the information on the Form 1040.  Per the Form 1040X, the Form 1040 had reported that AGI was $8,248,290, that itemized deductions were $3,237,182, and that there was a $1,625,707 tax liability.  The parties have not stipulated the amount used by the Leos on their 2017 Form 1040 of the carryforward deduction claimed for the 2013 bargain sale of the Bankhead Property.  We find this amount to be $2,474,461.  This is the

**[*18]** amount by which the Notice of Deficiency reduced the charitable-contribution deduction claimed by the Leos on their 2017 Form 1040. As we explain later, the Notice of Deficiency made its determination as against the amounts reported on the Form 1040, not the Form 1040X.

On July 22, 2020, the Commissioner mailed the Notice of Deficiency to the Leos. The Notice of Deficiency explained that the Commissioner had determined that the fair market value of the Bankhead Property was $4,300,000, not the $15,800,000 claimed by the Leos. The Notice of Deficiency stated: "Deductions in excess of the determined value of $4,300,000.00 have been taken in previous years resulting in no further carryover of charitable contributions for the 2016 and 2017 tax years." The Notice of Deficiency stated that the carryover amount of $8,535,670 reported on the 2016 Form 1040 had been reduced to zero and that the carryover amount of $5,970,414 reported on the 2017 Form 1040 had been reduced to zero. For tax year 2016 the Notice of Deficiency made an adjustment of $2,565,256 for "contributions." This was the amount of carryover charitable-contribution deduction claimed on the 2016 Form 1040 for the 2013 contribution of the Bankhead Property.

For tax year 2017 the Notice of Deficiency stated that the following amounts had been reported on the "return": itemized deductions of $3,237,182, taxable income of $5,011,021, and tax of $1,625,707. These amounts are the same as those stated on the Form 1040X as having been reported on the original Form 1040. These amounts are different from those stated on the Form 1040X as the "corrected" amounts (i.e., the amounts reported on the amended return consisting of the Form 1040X). We therefore conclude that the Notice of Deficiency referred to the amounts reported on the Form 1040, not the Form 1040X.

The only noncomputational determination made by the Notice of Deficiency as to tax liability was related to the value of the Bankhead Property on December 31, 2013. For tax year 2017 the Notice of Deficiency accounted for this determination by adjusting the charitable-contribution deductions by $2,474,461. From this we infer that the Form 1040 for 2017 had claimed a carryover charitable-contribution deduction related to the contribution of the Bankhead Property of the same amount: $2,474,461.

**[\*19]** The Notice of Deficiency determined that the 40% gross valuation misstatement penalty under section 6662(h)(1) was applicable.[5] As a result, the Notice of Deficiency determined a penalty under that provision of $342,104.80 for 2016 and $391,954.00 for 2017.

## OPINION

Our findings are made on a preponderance of the evidence. Therefore, it does not matter which party bears the burden of proof. *See Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005).

I.     *The value of the Bankhead Property was $4,050,000.*

Section 170(a)(1) authorizes a deduction for charitable contributions made within a taxable year to organizations described in section 170(c). If the taxpayer sells property to such an organization for less than fair market value, the taxpayer is allowed a charitable-contribution deduction for the difference between the fair market value and the sale price. *Stark v. Commissioner*, 86 T.C. 243, 255–56 (1986). The fair market value of property is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A-1(c)(2).

On December 31, 2013, Vanguard Properties sold the Bankhead Property for $575,000. The Leos take the position that the value of the Bankhead Property was $12,425,000. The Commissioner takes the position the value was $4,050,000. As explained *infra* Part I, we agree with the Commissioner.

    A.     *The contents of the Campbell appraisal are not binding on the Commissioner and the appraisal is unpersuasive to the Court.*

Referring to the Campbell appraisal, the Leos contend that "the photographic and descriptive contents of the report are binding on the parties." We disagree.

---

[5] In the alternative the Notice of Deficiency determined that a 20% section 6662(a) penalty was applicable because of an underpayment attributable to negligence under section 6662(c), a substantial understatement of income tax under section 6662(d), or a substantial valuation overstatement under section 6662(e).

**[\*20]** The parties executed a stipulation of facts which contained the following preamble:

> In accordance with Tax Court Rule 91, the below-signed parties agree to this Stipulation of Facts pursuant to the general terms of this preamble unless specifically expressed otherwise. All stipulated facts shall be conclusive. All stipulated exhibits shall be considered authentic and shall be admitted into evidence unless an objection is specifically reserved herein. All copies shall be considered electronic reproductions of the originals and shall be treated as if originals. The parties do not necessarily agree to the truth of assertions within stipulated exhibits, and such assertions may be rebutted or corroborated with other exhibits attached hereto or by additional evidence. All evidentiary objections are waived unless specifically expressed within this stipulation. All exhibits are redacted pursuant to Tax Court Rule 27.

Paragraph 73 of the stipulation states: "Attached as Exhibit 55-J is a Real Estate Appraisal, which states it was prepared by Harold E. Campbell Jr., MAI of Leland Speakes & Associates, and is dated December 5, 2013 (the 'Appraisal')." Exhibit 55-J is the Campbell appraisal.

No objection was stated in the stipulation to Exhibit 55-J. So we admitted the Campbell appraisal. The statements in the Campbell appraisal may therefore be considered by the Court in arriving at its findings of fact. *See Warsaw Photographic Assocs., Inc. v. Commissioner*, 84 T.C. 21, 42 (1985) ("[T]he exhibits may be used as evidence of the truth of the matters stated therein."). However, the statements in the Campbell appraisal need not be accepted as true by the Court. *See id.* As the preamble to the Stipulation of Facts states: "[T]he parties do not necessarily agree to the truth of assertions within the stipulated exhibits."

We are not persuaded by Campbell's description of the condition of the Bankhead Property. Campbell concluded generally that the Bankhead Property was in average condition and was well maintained. His conclusion may have been animated by his review of the five photographs that his appraisal said showed "typical views" of the Bankhead Property's nonoffice interior. There is no evidence that Campbell reviewed the photographs taken in 2013 by the environmental

**[\*21]** consultant hired by Mercy Foundation. Although Campbell's report stated that he made a "complete interior and exterior inspection," Campbell did not testify. We are unsure how exactly he arrived at his conclusions about the condition of the buildings. We have more confidence in the views of Everette E. Ladner III (the expert witness called by the Commissioner) and Terry Young, both of whom testified about how they determined the condition of the buildings. Furthermore, the documentary record suggests that Campbell precommitted to a value of at least $15,000,000 before doing any inspections. We infer that this precommitment impaired his objectivity in evaluating the condition of the Bankhead property.

We specifically reject Campbell's view that the electrical systems should be presumed to be in good condition. That presumption is contrary to the record. The electrical systems were not good.

We specifically reject Campbell's view that the plumbing systems should be presumed to be in good condition. That presumption is contrary to the record. The plumbing systems were not good.

We also reject Campbell's view that renovations through the years made the buildings as functional and useful as newer buildings. Although some renovations had been made over the years, the buildings were in a state of disrepair on the date of the contribution to Mercy Foundation. This conclusion is supported by the photographs taken by the environmental consultant, by the due-diligence inspection conducted by Terry Young, by the low rent earned on the half of the building area that could be rented, and by the failure of the owner to secure any lease at all on the other half of the building area. Furthermore, 16 months after the valuation date, the Bankhead Property sold for only $1,130,000.

In conclusion, Campbell's views on the condition of the buildings on the Bankhead Property are neither binding nor persuasive.

B. *Singleton's expert testimony that the value of the Bankhead Property is $12,425,000 is also unpersuasive.*

Singleton was called as an expert witness by the Leos.

Singleton opined that the Bankhead Property was worth $12,425,000 as of December 2, 2013.

**[\*22]** Singleton used two approaches to value the Bankhead Property: the comparable-sales approach and the income approach.

In his comparable-sales approach, Singleton considered 14 properties that he thought to be comparable to the Bankhead Property. However, Singleton relied principally on 2 of 14 comparables. These were comparable 1 and comparable 6.

Comparable 1 in Singleton's comparable-sales approach was a furniture factory in Ecru, Mississippi, which had a building area of 1,036,400. It sold in 2014 for $10.37 per square foot. The factory had been built in 1998. According to Singleton, its condition was "[a]verage," and its ceiling height was 34 feet. Singleton made no adjustment for differences in condition between the Ecru factory and the buildings on the Bankhead Property.

Comparable 6 in Singleton's comparable-sales approach a light manufacturing facility in Stillwater, Oklahoma. It sold in 2013 for $11.10 per square foot. The facility had been built in 1974 but was renovated in 1998. According to Singleton, its condition was "[a]verage," and its ceiling height was 24 feet. Singleton made no adjustment for differences in condition between the Stillwater facility and the buildings on the Bankhead Property.

On the basis of the comparable-sales approach, Singleton opined that the Bankhead Property was worth $11 per square foot of building area. He therefore concluded that the approach suggested that the property was worth $11 × 1,103,969 square feet, or $12,144,000 (rounded). As to the total building area of the buildings on the Bankhead Property, Singleton opined that a sketch made by the county tax assessor showed the most accurate calculation of the building area. But Singleton did not explain why he did not use the 1,093,345 square foot total shown on the sketch.

In addition to a comparable-sales approach, Singleton used an income approach to value the Bankhead Property. He opined that the market rent of the Bankhead Property was $1.50 per square foot of building area. He therefore figured total rent per year (before adjusting for vacant space) would be $1,655,954 = $1.50 × 1,103,969 square feet. Although he understood that only about 50% of the property was rented at the date of valuation, Singleton made only a 20% adjustment as a vacancy discount. With this adjustment, Singleton calculated that the annual operating income from the property was $1,270,568. Singleton

**[\*23]** opined that the appropriate capitalization rate of the property was 10%. Using this capitalization rate, Singleton concluded that the income approach suggested that the value of the property was $12,706,000.

Singleton ultimately estimated the value of the Bankhead Property by assigning equal weight to the results of the sales-comparison approach and the income approach. Using this weighting, Singleton opined that the value of the property was $12,425,000.

Singleton explained that on May 1, 2014, he did a one-hour inspection of the Bankhead Property that included limited portions of the interior of the buildings. However, Singleton explained that he assumed that Campbell's view of the condition of the buildings was correct and that if this assumption were incorrect, Singleton's valuation would be wrong. Singleton stated that an "extraordinary assumption and limiting condition" of his appraisal was that the buildings were in average condition. He described all buildings on the Bankhead Property as having been "upgraded over the decades to the date of valuation," having an "[a]ssumed average" condition, and having a "remaining economic life of 25 years."

The Leos urge us to adopt Singleton's conclusion that the value of the Bankhead Property was $12,425,000. They contend that Singleton's method of valuing the Bankhead Property, an equal weighting of the sales-comparison approach and the income approach, is sound.

We do not agree with Singleton's estimate of value.

We are not persuaded of Singleton's conclusion that the Bankhead Property was in average condition. Singleton did not thoroughly inspect the Bankhead Property. Instead, as Singleton admitted, he largely relied on Campbell's conclusions about the condition of the Bankhead Property.[6] As we have already explained, we are unpersuaded by Campbell's conclusion that the buildings were in average condition and well maintained.

We are unpersuaded of Singleton's conclusion that under the sales-comparison approach, the value of the Bankhead Property was

---

[6] Singleton testified that in addition to reviewing Campbell's report, he reviewed photographs of the Bankhead Property taken in 2010, given to him by petitioners' counsel. His report contains 14 photographs from 2010, but these are all photographs of the exterior. Singleton's review of these 14 photographs does not persuade us that his view of the condition of the buildings is correct.

**[\*24]** $12,144,000. Using the sales-comparison approach, Singleton relied on Comparable 1 and Comparable 6. The comparable buildings were, in Singleton's view, in average condition. In our view, they are in better condition than the buildings on the Bankhead Property. Comparables 1 and 6 are not reliably comparable to the Bankhead Property.

We are also unpersuaded of Singleton's conclusion that under the income approach, the value of the Bankhead Property was $12,706,000. Using the income approach, Singleton opined that the market rent (meaning the rent that could be earned on the Bankhead Property) was $1.50 per square foot. Singleton determined this $1.50 estimate from 17 leases of properties that he thought comparable. Singleton included in his report photographs of the buildings subject to the 17 leases. The condition of those buildings appears to be at least average. Singleton made no adjustment to account for the difference in condition between the buildings subject to the 17 leases and the buildings on the Bankhead Property because he viewed the condition of the Bankhead Property buildings as average. We do not agree with Singleton that the condition of the buildings on the Bankhead Property was average. Therefore we do not think the Bankhead Property could earn rent of $1.50 per square foot.

The Leos contend that the Commissioner's expert witness, Ladner, conceded in his testimony that $1.50 per square foot was the "market" rent. But Ladner explained that the Bankhead Property could *not* command a market rent. Ladner explained that compared to the market the buildings on the Bankhead Property were in "poor" condition, the layout of the buildings was awkward, and the ceilings were too low. Thus, Ladner's testimony does not support the Leos' view that a market rent for the Bankhead Property would be $1.50.

Another reason that Singleton's use of the income method is unpersuasive is that the $1.50 rent that he assumed could be earned on the Bankhead Property far exceeded the rent charged under an actual lease of a portion of the property. Recall that in September 2010 Vanguard Properties executed a lease to Newport Furniture of about half the building area for 48 cents per square foot. Karl Leo testified that in his view this rent was not an arm's-length rent. He claimed the rent was artificially low because Vanguard Properties wanted to make sure that Newport Furniture stayed in business. He explained that it was in Vanguard Properties' interest for Newport Furniture to stay in business so that it could pay rent on the property and maintain the

[*25] property. We do not disagree that these considerations motivated Vanguard Properties' decision to settle on rent of 48 cents per square foot. But these considerations would have influenced any hypothetical owner of the Bankhead Property. Such a hypothetical owner would have also negotiated a rent low enough to keep Newport Furniture on the Bankhead Property. Thus, the fact that Vanguard Properties had an incentive to keep the rent low does not disturb the proposition that the 48-cent rent that it negotiated was an arm's-length rent for the leased portion of the Bankhead Property. Karl Leo's erroneous view that the Newport Furniture lease was not arm's length influenced Singleton's opinion. Singleton disregarded the September 2010 lease because he was informed by Karl Leo that the lease was not arm's length. Singleton should not have disregarded the lease. We view the lease as an arm's-length lease.[7]

Another problem with Singleton's income approach is that he assumed a vacancy rate of 20%. That would be consistent with 80% of the building area being rented. But, in reality, only half the building area was under lease as of the valuation date (and during the three years before the valuation date).

Finally, Singleton's ultimate conclusion that the Bankhead Property was worth $12,425,000 is inconsistent with the fact that the property was sold for only $1,130,000 in May 2015.

C.    *Ladner's testimony that the value of the Bankhead Property is $4,050,000 is persuasive.*

Ladner, who was called by the Commissioner as an expert witness to value the Bankhead Property, relied exclusively on the sales-comparison approach. Using this approach, he determined that the Bankhead Property was worth $3.70 per square foot of building area. Under his calculation, the Bankhead Property was worth $3.70 × 1,093,345 square feet, or $4,050,000 (rounded)

Ladner inspected the buildings on February 7, 2024, with Terry Young.[8] Ladner also interviewed prior tenants of the buildings. He determined that on the date of valuation the buildings were near the end of their economic life without substantial repairs and renovations.

---

[7] Singleton did not consider the December 19, 2013, Newport Home lease, which was 45 cents per square foot. In our view, this lease was also arm's length.

[8] By then John Young had died and Terry Young had become the owner of New Albany Acquisitions, which owns the Bankhead Property.

**[\*26]** In support of this conclusion, he determined that maintenance had been deferred on the buildings as of the valuation date. Furthermore, Ladner observed that New Albany Acquisitions had found it necessary to tear down substantial portions of the buildings and had spent millions of dollars renovating the remaining building areas. Furthermore, Ladner concluded that the buildings as of the valuation date had roof leaks, outdated electrical systems, and nonfunctioning HVAC systems.

Ladner relied on sales of six comparables. Ladner opined that the condition of the buildings which were the subject of his six comparable sales were, respectively:

- above average/15 year effective age;

- average/35 year effective age;

- above average/12 year effective age;

- average/20 year effective age;

- average/20 year effective age; and

- average/20 year effective age.

Ladner made four types of adjustments to the transaction prices of the comparable sales he considered. First, Ladner adjusted for the age and condition of the buildings. These adjustments were substantial because they accounted for the "inferior" condition of the buildings on the Bankhead Property. Second, Ladner adjusted for the size of the building area. Third, Ladner adjusted for the percentage of finished office space. Fourth, Ladner adjusted for the ratio of the area of the land to the area of buildings.

Ladner considered a sales-comparison approach using land area. That approach resulted in a value of $10,000 per acre × 136.4 acres, or $1,365,000 (rounded). Under this approach, Ladner made four sales comparisons. However, Ladner opined that the sales-comparison approach using land area was not appropriate because a typical purchaser would rely on a sales-comparison approach using building area. Ladner gave no weight to the sales-comparison approach using land area.

Ladner opined that the income approach was not appropriate for valuing the property because the Bankhead Property had not been

[*27] developed to generate income and because the property was only partly leased on the date of valuation.

In our view Ladner's opinion of the value of the Bankhead Property is persuasive.

Ladner's view of the condition of the buildings was sound. Ladner inspected the buildings. He interviewed the current owner of the buildings (Terry Young) and the former tenants. Ladner's view that the buildings were in inferior condition is corroborated by the testimony of Terry Young, by the testimony of the director of the local-government development district, by the photographs made in 2013 by Mercy Foundation's environmental consultant, and by other facts: (1) only half the building area was leased as of the valuation date; (2) the lease was at a rent below the rent for other commercial buildings because of the poor condition of the Bankhead Property buildings; (3) portions of the buildings had to be torn down after the 2015 transfer from Mercy Foundation to New Albany Acquisitions; and (4) other portions had to be renovated.

The "central criticism" lodged by the Leos against Ladner is that he failed to use an income approach to valuation. In the Leos' view the market rental rate for the Bankhead Property was $1.50 per square foot. The Leos claim that had Ladner used an income approach, he would have assumed that the Bankhead Property would generate income from renting the buildings at $1.50 per square foot. As a result, according to the Leos, Ladner would have arrived at a value conclusion similar to Singleton's $12,706,000 value conclusion. We are unpersuaded by this criticism. An income approach is not the best approach to valuing the Bankhead Property. The Bankhead Property was only partly leased at the valuation date. The unleased portion of the property was unrentable, at least without major repairs or renovations.

Furthermore, using the income approach would not have altered Ladner's conclusion. Singleton, who used the income approach, testified that had he relied on rent of 57 cents per square foot found in the lease to Roberts Trucking, instead of the $1.50 rent from leases of other properties he deemed "comparable," his valuation under the income approach of the entire Bankhead Property would have been $4,492,150. Even this estimate is likely too high because (1) it assumes a 57 cents per square foot rent instead of a 48 cents per square foot rent (the rental rate in the lease to Newport Furniture of about half the building area) or 45 cents per square foot rent (the rental rate in the lease to Newport

**[\*28]** Home of about half the building area)[9] and (2) it is consistent with 80% of the Bankhead Property's being rented. Our point is that even had Ladner adopted an income approach similar to that employed by Singleton, this would not have resulted in a value higher than the value Ladner estimated using a comparable-sale approach. In sum, Ladner's decision to avoid an income approach does not impair the credibility of his conclusion that the Bankhead Property was worth $4,050,000.

We agree with Ladner that the property was worth only $4,050,000 on the date of valuation.

Our view of value is based on the sales-comparison approach as used by Ladner. But our view is also supported by other facts in the record:

- The unleased portion of the Bankhead Property could not be rented out despite the efforts of Newport Furniture and the local-government development authority.

- On the valuation date, December 31, 2013, the Bankhead Property was producing rent of only $255,750 per year ($202,500 from Newport Home, $47,250 from Industrial Timber, and $6,000 from Roberts Trucking).

- In May 2015, 16 months after the valuation date, the Bankhead Property was sold for only $1,130,000. *See Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111 (6th Cir. 1984) ("In determining the fair market value of property, little evidence could be more probative than the direct sale of the property in question."), *rev'g and remanding* T.C. Memo. 1982-440.

Given these other facts, even without Ladner's testimony we would find that the value of the Bankhead Property was $4,050,000.

---

[9] Although the lease to Industrial Timber was for $1.05 per square foot, this lease covered only 45,000 square feet of the easternmost building. We are not confident this rental rate is a reliable indicator of the rental value of the other portions of the building area.

**[\*29]**  D.     *The Leos' fallback position that the value of the Bankhead Property was $7,941,000 has no merit.*

The Leos made a fallback argument in their closing statement that the value of the Bankhead Property was $7,941,000.  This theory has three components:

(1) the land value alone of the Bankhead Property (i.e., excluding the building value) was $1,365,000,

(2) the value of the "interior finishes" of the 32,800 square feet devoted to office space in the buildings was $1,312,000, and

(3) the value of the buildings (apart from the value of the aforementioned 32,800 square feet of "interior finishes") was $18,800,000 (the insured value of the property), reduced by depreciation of 72%, to arrive at $5,264,000.  According to this theory, the value of the Bankhead Property was $7,941,000 = $1,365,000 + $1,312,000 + $5,264,000.

As the Leos point out, Ladner indirectly used an estimate of $1,365,000 for the land value of the Bankhead Property.  He used this estimate in his sales-comparison approach to make adjustments for the conditions of the buildings.  The Leos rely on this amount in the first component of their fallback argument.

The second component of the fallback argument relates to adjustments Ladner made to his comparables for the varying percentages of office space.  He used $40 per square foot for his adjustments.  The adjustment suggests to the Leos that Ladner believed that office space in both the comparable buildings and the Bankhead Property was worth $40 per square foot.  As to the Bankhead Property, a $40 per square foot valuation seems generous to us.  The industrial development director of the local-government development authority, who made 10 to 15 visits to the Bankhead Property, credibly testified that the offices were outdated.  His opinion is supported by photographic evidence of the offices.  Furthermore, after the date of valuation, New Albany Acquisitions found it necessary to gut the office space.  This action corroborates the low value of the "interior finishes" of the offices on the valuation date.  We are not so certain of the validity of the $40-per-square-foot assumption that we would build that assumption into a

**[\*30]** new valuation conclusion such as that proposed by the Leos in their fallback argument.[10]

The third component of the fallback argument assumes that the value of the buildings on the Bankhead Property was equal to the insured value of $18,800,000. This assumption is invalid. Although we admitted evidence that the insured value of the buildings was $18,800,000, we did so under the condition, proposed by the Leos themselves, that we take the insured value into consideration only for the purpose of determining whether the Leos had reasonable cause for their return positions.[11] It is improper for the Court to rely on the insured value to determine the value of the Bankhead Property.

The second and third components of the Leos' fallback argument are unsupportable. The argument is unpersuasive.

II.  *The amounts of the deficiencies and underpayments determined in the Notice of Deficiency are correct.*

Although we determine that the value of the Bankhead Property was less than the $4,300,000 value determined in the Notice of Deficiency, the tax liabilities for the 2016 and 2017 tax years are the same with a $4,050,000 valuation as with a $4,300,000 valuation. Therefore, the deficiency for each tax year is also the same with a $4,050,000 valuation as with a $4,300,000 valuation. It follows that the amounts of deficiencies determined in the Notice of Deficiency are correct.

The same reasoning applies to the amount of the underpayment determined in the Notice of Deficiency for each year. *See* § 6664(a)(1) (defining an underpayment generally as the tax liability minus the tax reported on the return). These amounts of underpayments are correct. We explain below that the underpayments are attributable to a gross valuation misstatement.

---

[10] If Ladner were wrong to assume that the office space on the Bankhead Property was $40 per square foot, correcting that error would reduce the estimated value of the Bankhead Property. Thus, any such error was in petitioners' favor.

[11] Because we determine that the value of the Bankhead Property is $4,050,000, reasonable cause is not relevant. *See infra* Part III.

**[\*31]** III.    *The Leos are liable for the 40% gross valuation misstatement penalty.*

Section 6662(h)(1) imposes a 40% penalty on the portion of an underpayment of tax that is attributable to a gross valuation misstatement. An underpayment of tax is defined generally as the tax liability minus the tax reported on the return. § 6664(a)(1). A gross valuation misstatement exists if the value of any property reported on the return is more than 200% of the correct value. § 6662(e)(1)(A), (h)(1), (2)(A)(i). The section 6662(h)(1) penalty "applies to any portion of an underpayment for a year to which . . . a deduction that is attributable to a . . . gross valuation misstatement for the year in which the carryback or carryover of the . . . deduction . . . arises." *See* Treas. Reg. § 1.6662-5(c)(1).

The value of the Bankhead Property claimed on the Leos' 2013 return was $15,800,000. This reported value exceeds $8,100,000, which is 200% of the $4,050,000 amount we determine to be the value of the property. Thus, there is a gross valuation misstatement for 2013. Furthermore, the underpayments for 2016 and 2017 are attributable to this gross valuation misstatement. *See* Treas. Reg. § 1.6662-5(c)(1).

We sustain the Commissioner's determination of penalties.[12]

To reflect the foregoing,

*Decision will be entered for respondent.*

---

[12] There is no reasonable-cause exception to the penalty for gross valuation misstatements. § 6664(c)(3). Furthermore, the parties have stipulated that the Commissioner has satisfied the supervisory-approval requirement of section 6751(b)(1) as to the penalty.